Good afternoon. Good afternoon, Your Honors. May it please the Court, my name is Tanya Whiteleather. I represent Carlos Baquerizo, a young man who has autism, but who is, by many accounts, very high-functioning with many of his skills. We are here about an appeal regarding the 9-10 school year and the 11-12 school year. And the allegations that we have made that Carlos was denied a FAPE, a pre-appropriate public education. One of the interesting little twists in this matter is that there was a settlement agreement in March of 2009, just prior to the first school year's IEP, the 9-10 IEP. And in that agreement, the parties who had been wrangling over whether assessments would be completed and how they would be completed, agreed to finish two incomplete assessments. There is no preclusion of further assessments, no statement in that settlement agreement, which has become an issue in this matter, that no further assessments would be done. I happen to agree with you on that, but I'm still troubled by the rest of the case, so move forward. Certainly. And if I may, we did have a prior case in which the guardian was painted as a terrible person who had, in fact, obstructed the process. If the court takes that as it was, and says she was a terrible person, she obstructed through the day before the IEP, June 17, 2009. Let me just short-circuit this a little bit. We have, with respect to the 2008-2009 school year, under the Garrett decision, which decided that your, I guess, what do we call her, the guardian, I guess we call her the guardian, had indeed obstructed procedurally and practically with respect to this matter. In that year, the Garrett decision was upheld by the district court. It was not appealed to our court. So whatever was decided there, that's not before us, and the conduct of the guardian is what was alleged there as far as the record is concerned, right? We also have the 2010-2011 school year where a separate judge decided that there was obstruction, and that was upheld by the district court and also upheld by our court. So again, we've got two separate school years, not the ones before us today. In each instance, they concluded that the guardian indeed obstructed both the procedural actions and any facility making Carlos available to be tested. What are we to do with those finalized decisions with respect to the prior years? Do we ignore them in terms of our evaluation of the actions of the guardian in the two years that are before us today? I think because each year is a new year, and that's where I was going with this, if I may. And the prior decisions happened at times that there were communications going back and forth between guardian and district. This won't work. I'm not available this day. She's a working lady who's taking care of her nephew with a disability. There were agreements to continue IEPs. There were agreements that assessments would be done. She brought him out in one of those years ten separate times she took off from work. And again, I don't mean to re-argue those. I agree with them, but it's not my point. What are we to make of that? I mean, it sounds like this is a continuation each year, except the very first year where you won, for the guardian to get money to pay for sending Carlos to a private school. As we were proceeding through, and I was very much involved in this matter, so I can tell you from personal experience as well, the guardian had agreed, we finally resolved the issue of the March 9th settlement agreement. The incomplete assessments came to an IEP the day after June 17th and was told by the district for the very first time on June 18th, 09, we don't have enough information. We can't do goals. We like this. We like that. And after having wrangled through trying to get an assessment plan in the prior case, signing an agreement, assuming it was all resolved, once again the district was saying, we don't have information. But counsel would expect... Can I just ask, when did the settlement conclude, and then when did this meeting occur? Settlement was in March of 09, and the agreement, or the IEP, was in June. In that interval, there was no request for information? There had been a previous assessment plan signed. The guardian had signed releases and allowed access of staff. That's all in our record in this matter, because they looked at the prior year. The district had access to Carlos. Nobody precluded that. There was this incomplete, that was part of the settlement agreement. Three months later, at the IEP meeting, the guardian was told, we still don't have enough information. Isn't that all contradicted? I mean, basically, you have said X, and the school district and the private school say Y. They just don't agree. As far as what? As far as access to Carlos. The district was given access. There were releases signed. But the record also suggests that they were not given access to him. That is incorrect. Can you point to me, in the record, an instance where you say that he was given access, and the school district said, yeah, we were given access, just like we asked for. There were releases. I can find the specific. What happened was, in the 609 IEP, the district literally said, oh, we didn't have access to him, but that was incorrect. Because the documentation there indicated, we signed releases, and they were in the record. I can point those out in a minute. But there were releases signed. The district did go out and access him, did have the ability to complete assessments. There was not a denial. We're looking at an entirely different record. I read this thing. It is a huge, huge record. It was so big that trying to transfer it to my colleagues, it took, I forget how long. Almost a gigabyte. To get it there, because it was so massive. And when you look at the record, what I find, again, I don't know if the record's true or not, but it's the record. And what I find is again, and again, and again, and again, that at the very least, your position, and the school district's position, and to some degree, the private tutor, are in conflict. Nobody agrees on anything. And it's also clear that before you can do an IEP, the school district has to have access to Carlos so that they know how he's doing on these various things. Sometimes you didn't ask for things like the anxiety report, as I understand it. In other instances, you have the guardian saying, you know, he has to have a one-on-one situation. I don't want him mainstream. And that's when the district judge says, you can't have it both ways. Which is it going to be? If I can. He learns, what was said was he learns best one-on-one. Nobody said he had to have one-on-one. There's a big difference. This is a young man. Huge difference. And he was learning better in a situation of one-on-one. That did not mean that he had to have one-on-one. So I'm very careful with that distinction. We weren't speaking to the IEP team. The testimony was very clear to that point, too. We have a young man who, when the parties we believed had resolved their differences, came to an IEP on June 18th, was told the district suddenly still, even though they said they didn't need any more assessments. And remember, this is about Carlos. When we step back, I'm trying to get a handle on what the substantive difference for Carlos is in this. Because when it defaults to the guardian's choice, it winds up on his prior to tutoring one-on-one. My understanding is that the district proposed a placement in a small group, so there would be more than one-on-one, but it would be with disabled students. So in a lot of these cases, the parents are objecting because they want the students mainstream, so they study candid. What is it that you want? Did the guardian ever propose the ideal settings that they would be looking for? We wanted the district to comply with IDE and to follow section 14.12 and 14.14, which require the assessments. And then once the assessments are completed, because you don't do this in a vacuum. You have to identify the student's needs. And when June 18th, 09, they say, oh, well, we still don't know, we were shocked. And they didn't want to assess anymore. They didn't offer to do anything other than after he'd been placed. You must do the assessment, determine the needs, create the goals, as it's all in my brief, and then based upon the goals, you determine placement. I'm acutely familiar with IDEA processes. I've written opinions on them. The whole concept of this is to get the parents and the teachers and the school together and have an appeal process if there's some dispute. But usually in these cases that I'm familiar with, the parents have some idea of what they would prefer their child to be in. And I haven't heard any response as to what does the guardian think would be a better alternative. If she's just trying to get the school district to pay for a continuation of the private tutoring, that's fine. That's a nice understanding. What is it that the parents or the guardian never put forward? Or if you're telling me she didn't put forward anything, that's what I'd like to know. We talked about the assessment, that anxiety was crucial for him. Students with autism often have anxiety, and this has been identified for him forever. So that when you look at a placement, and we were looking at potentially, but we didn't get to talk about it. It never was discussed at the IEP meeting. We were talking about the guardian and I. Some sort of placement with general ed time, mainstreaming, it was never offered. And LRE, the issue of LRE, which was never discussed, and which was in the district court, looked at, well, he would get speech and language OT and other services. LRE looks, or in the Rachel H. Cates, looked to services in the classroom to allow the student to stay in a general education classroom. That was never, ever discussed, even for 09-10 or for 11-12. So we were looking for an identification of the services that would address his ability to be in the general ed for at least part of his school day. Not saying that he had to be there all the time. We couldn't even get there because there was no assessment. I do want to save some time. I do want to mention that the burden was on the district. The district never showed under Rachel H. that he should be excluded from general ed in total. Counsel? Good afternoon, Your Honor. Dan Harbaugh for Garden Grove Unified School District. And I would start by reiterating the work I had for the record was exhaustive. I think it's rare, possibly, although I think in IDA cases it's relatively common that you have two levels of adjudication before you get to your honor's review of the case. In this case, you had Garrett's decision, Myers-Kreuger's decision, Roof's decision, Selma I, Selma II, and Your Honor's, the Ninth Circuit's decision with respect to Selma I or Selma II. And I have not seen in 25 years of IDA practice as exhaustive a record. I do want to correct a couple of quick things just for your information as you review the case. The sum of the agreement was in on May 7, 2009, and the counsel just misspoke and didn't think it was in March. It was in May of 2009, the month before the IEP. Judge Roof, Judge Garrett, Judge Selma all very clearly said that that lead up to the 2009 IEP. The Garrett decision addressed that 13 months prior to the 2009 IEP. But all of those who reviewed it, Garrett, Roof, and Selma all agreed that the lack of cooperation and destructionism prior to the 2009 IEP not only resolved the matter in favor of the district under the Garrett decision, but impacted the ability of the district to develop an IEP in 2009. Counsel, what weight do we give to the previous decisions of the ALJs, Selma, the fact that our court wanted to appeal to our court one time and we approved it in another? The fact that there was a finding of lack of cooperation, does that carry over in any way to the two school years before us in this case? Yes, very clearly with respect to Garrett. The Garrett decision was involved 13 months prior to the 2009 IEP. And the Roof decision, you know, the interesting thing about the Roof case, the one that we're under review here, the ALJ and Judge Roof, at the initial part of the case, we had made a motion to preclude evidence as to the facts set forth in the adjudication of the Garrett decision. That was initially denied, and we basically reviewed much of this before Judge Roof. If you look at the footnote, I think the second or third footnote in her decision, it specifically says she declined to grant the motion, but ultimately, when she reviewed the facts herself, having heard the evidence essentially again, she came to the same conclusion. So I think great weight is the answer to your question, and Judge Selma has a lot of IEA cases. I've had numerous with him, and I know he has many more that I don't deal with. So he's a very sophisticated and savvy jurist with respect to this kind of case. And is there a case law in any circuit that makes it clear that if a guardian or a parent obstructs the ability of a school district, in this case, to perform, you know, to do an IEP, to do an IED, and ultimately operate in faith, if they do that, that that basically shifts everything in favor of them? It doesn't shift everything, but it's an equitable analysis, and I'll have to find the site for you. Judge Garrett cites it directly. Let me find it. I think it's in her decision. I can find it for you, but it's very clear, it's in the end part of her decision, and Judge Selma does it as well, that parents cannot expect public funding of private programming when they are the cause of the obstruction, that reduce the efficacy of the process. It's just very clear in the law. Now, with respect to the 2011, I also wanted to make a point that in answer to your question regarding the merit of relying on the prior decisions, one of the things that both Judge Roof and Judge Selma pointed out was that even after the Odan IEP, in the lead-up to the 2010 IEP, as well as in the lead-up to the 2011 IEP, remember the 2010 IEP had already been adjudicated, and that was in the record. As well as Judge Meyer's Krieger's decision with respect to that, Judge Selma's decision, there was post-June 2009 obstruction as well. For example, in December, I think it was December, it was either September or December 2010, trying to get way out in front of this, the district sought information from the guardian, sought a release of information, prevented the district to speak with the NROC. That was declined on the basis that it was premature. So we get too close to the IEP, it's too late, we don't have enough, we're too premature, too early, we're premature. Is that the year when the 30-day reevaluation was offered as part of the IEP? In both years, that was offered on the very same basis. So I also, I guess the last thing I would say is I want to correct one of counsel's statements. It is the case, with respect to the proposed placement, or the ongoing placement, that students get from the guardian imposed upon the student, that one-to-one, non-prudential, non-licensed, not academically licensed program, the student's prior counsel is cited at footnote 7 in the district's opening briefer, answering briefer, specifically said, not what counsel indicated, but that the student, in their opinion, could only be educated in a one-to-one setting. Which leads to the LRE issue that's so important in this case. We moved him, tried to move him, from a one-to-one non-licensed program to a district. That's why Gwendolyn Park, or whatever it was. That was Gwendolyn Park's kitchen line of residence. And that was on a transitional basis? Yes, in both cases, especially more importantly in the second of the two. By the second IEP, by June 2011, Carlos had been in the first RLC and PSLC, the one-on-one setting, literally in a room with an unprudential teacher for four years. So all the judges who considered this point realized that, from a purely LRE point of view, it didn't make any sense to move him directly into a gen ed setting, because it was so long, it had been so long, that he had had this one-on-one setting. LRE is the least restrictive environment. I thought the audience might like to know that. Okay. I was actually very prepared when we were handing out the report. Yeah, there should be an acronym, Liz. All right. Thank you, Ron. Thank you very much. Have fun. Thank you. As far as the June 2009 IEP, the district never invited RLC. The district, it's their duty to invite individuals who are necessary. Never ask for information, and never sign release. And in the brief, there's a whole section at 1832 through 1852, and then 1849 and 1990. I won't give you all of that, but that is in our brief. We came to the IEP meeting. There hadn't been anything done. And again, separately, if there's a finding that somehow the guardian was a bad person, June 18th was a different day. June 18th, we said, learned that for the first time, there was a lack of information. And the guardian said, please, and requested an assessment. And that's at ER 1157. Said, here we are. We're trying to plan for next year. There was no assessment done. And there was none offered. And no release sought. And nobody would go to RLC to get information. The guardian was stuck. And she said, fine, I'm going to ask for IEEs. IEEs are, under IDEA, can be an equitable remedy. So take everything from June 17th through 9th back. On the 18th, she's acting reasonably. She's saying, please, I need more assessments. And the district refuses to do it. The burden, again, for the 1112 was on the district. And the test cases that Rachel H., Sacramento versus Rachel H., which says you go in the factors, you look at those very clearly to see whether the student should be moved. Not once does Rachel H. say, if a student has had one-to-one services, you shouldn't put him in JAN for part of his day. Not once. And the court didn't get that. And by the way, that one-to-one provider was the same person that this court approved of and ordered reimbursement for in the decision I first brought to the mic. That was with Barbara Clements, RLC. Any other questions about my colleague? Thank you very much, both counsel. We appreciate it. The case just argued is submitted.
judges: Fisher, M. Smith, Owens